# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

William D. Foord, MD, individually
and as Trustee and Executor of
the Estate of Carol C. Foord

    v.

Capital Region Health Care Corp.
d/b/a Concord Hospital et al.

Case No. 17-cv-596-AJ
Opinion No. 2020 DNH 011

## MEMORANDUM ORDER

The plaintiff, William Foord, M.D. ("Dr. Foord"), brings
this action alleging that his wife, decedent Carol Foord ("Ms.
Foord"), received inadequate care from several medical providers
prior to her death on November 24, 2015.[1]  Doc. no. 51.  Dr.
Foord seeks recovery for violations of the Emergency Medical
Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd,
medical malpractice, and loss of consortium.[2]  Id.  One of the
defendants, Capital Region Health Care Corp. d/b/a Concord
Hospital ("Concord Hospital"), moves for summary judgment.  Doc.
no. 81.  Dr. Foord objects.  Doc. no. 90.  For the reasons that

---

[1] The amended complaint alleges that Ms. Foord died on November
26, 2015, but Dr. Foord identified her actual date of death as
November 24, 2015 in his deposition.  See doc. no. 81-2 at 1.
[2] Dr. Foord brings the medical malpractice and loss of consortium
counts under New Hampshire law.

follow, the motion is granted as to the EMTALA claim and the state law claims are dismissed without prejudice.[3]

## I.   **Summary Judgment Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016).  "An issue is 'genuine' if it can be resolved in favor of either party, and a fact is 'material' if it has the potential of affecting the outcome of the case."  Xiaoyan Tang, 821 F.3d at 215 (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)) (internal quotation marks omitted).  At the summary judgment stage, the court "view[s] the facts in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in the nonmovant's favor . . . ."  Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 312 (1st Cir. 2016) (first quoting Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999); then quoting Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014)).  The court will not, however, credit "conclusory allegations, improbable inferences, and unsupported speculation."  Fanning v. Fed. Trade Comm'n, 821

---

[3] As the court declines to exercise supplemental jurisdiction over Dr. Foord's state law claims, it need not consider Concord Hospital's request for summary judgment on those claims.

F.3d 164, 170 (1st Cir. 2016) (quoting Méndez-Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011)), cert. denied, 137 S. Ct. 627 (2017).

"A party moving for summary judgment must identify for the district court the portions of the record that show the absence of any genuine issue of material fact." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). Once the moving party makes the required showing, "the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." Id. (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'" Id. (citation omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The nonmoving party's failure to make the requisite showing "entitles the moving party to summary judgment." Id.

## II.  **Background**

The relevant facts, viewed in the light most favorable to Dr. Foord, are as follows. On November 14, 2015, Ms. Foord presented at Memorial Hospital's ("Memorial") Emergency Department with numbness and sensory deficit on the left side of

3

her body, along with hemi-paralysis and deadweight on her left side. Doc. no. 90 at 3. She was examined by Dr. James Clifford, who consulted with a radiologist. Doc. no. 81-1 at 2.[4] Ms. Foord's providers at Memorial reviewed her tests and concluded that her symptoms were caused by old brain calcifications, not a subarachnoid hemorrhage. Id. They recommended that Ms. Foord follow up with her primary care provider ("PCP"). Id. The next day, she called her PCP, who advised her to go to Maine Medical Center ("MMC"). Doc. no. 81-2 at 2-3.

On November 16, Ms. Foord presented to MMC and was examined by a neurologist, who recommended that she stay overnight and undergo magnetic resonance imaging ("MRI") and magnetic resonance angiography ("MRA") tests.[5] Doc. no. 81-1 at 2. However, the Foords left MMC against medical advice. Doc. no. 81-2 at 4. The next day, November 17, Ms. Foord called her PCP to arrange for imaging studies at Memorial, but her insurer did not approve them. Id. at 5. On November 18, Ms. Foord again

---

[4] The court may rely on Concord Hospital's narrative for facts that have not been opposed by Dr. Foord. See LR 56.1(b) ("All properly supported material facts set forth in the moving party's factual statement may be deemed admitted unless properly opposed by the adverse party.").

[5] An MRA "is a noninvasive test that is used in evaluating the blood vessels in a patient's brain and neck." Gage v. Rymes Heating Oils, Inc., No. 14-cv-480-PB, 2016 WL 843262, at *3 n.2 (D.N.H. Mar. 1, 2016).

attempted to have the studies done at Memorial, but her insurer had still not approved them.  Id.  Ms. Foord's PCP then referred her to Concord Hospital.  Id.

On November 19,[6] Ms. Foord presented at Concord Hospital's Emergency Department.  Doc. no. 81-4 at 5.  When the Foords arrived, they were triaged "quite immediately."  Doc. no. 81-2 at 6.  Ms. Foord underwent an evaluation of her chief complaint, assessment of her airway, breathing, circulation, and mental status, and performance of her vital signs, including temperature, blood pressure, pulse, respiratory rate, oxygen saturation, and pain level.  See doc. nos. 81-1 at 3, 81-4 at 7. Hospital staff also conducted an initial health screening covering her medical history, recent travel, tobacco use, and immunization history.  See doc. nos. 81-1 at 3, 81-4 at 7. Subsequently, Ms. Foord underwent additional neurological, respiratory, cardiovascular, extremity, Glasgow coma, abdominal, and genito-urinary evaluations.  See doc. nos. 81-1 at 3, 81-4 at 7.

Dr. Fox then saw Ms. Foord and took a chief complaint, a history of present illness, and past medical, medication, surgical, and social history.  Doc. nos. 81-2 at 13, 81-4 at 2.

---

[6] The amended complaint alleges that Ms. Foord presented at Concord Hospital on November 18, 2015, but Concord Hospital's records show that her visit occurred on November 19, 2015.  See doc. no. 81-4 at 2.

Dr. Fox also conducted a physical exam that included an overall general assessment, vital signs, and an examination of the head, eyes, ears, nose, throat, neck, lungs, heart, abdomen, extremities, and neurological function. Doc. nos. 81-1 at 4, 81-4 at 2-3. She also performed a stroke scale. Doc. no. 81-4 at 7. Dr. Fox consulted with a neurologist, who recommended an MRI and an MRA of the brain. Doc. nos. 81-2 at 13, 81-4 at 3. Those tests were performed, though Dr. Foord points out that the MRA was performed on the Circle of Willis, which is distinct from the surface of the brain. Doc. nos. 81-4 at 3, 90 at 4. Dr. Fox discussed the results with Dr. Venus, the interpreting radiologist, who believed the results could indicate a subarachnoid hemorrhage and recommended a computerized tomography ("CT") scan. Doc. no. 81-4 at 3. When Dr. Fox informed Ms. Foord of this recommendation, Foord said that she thought the area of concern resulted from a traumatic brain injury as a child, not from a subarachnoid hemorrhage. Id. She also informed Dr. Fox that her providers at MMC told her she did not have a subarachnoid hemorrhage. Id.

Ms. Foord underwent a CT scan. Doc. no. 81-4 at 3, 21-22. After reviewing the results of this scan, Dr. Venus concluded that Ms. Foord did not have a subarachnoid hemorrhage. Id. He

also recommended an MRI with gadolinium[7] and a magnetic resonance venography ("MRV") test.[8]  Id. at 3, 18.  Dr. Fox diagnosed Ms. Foord as follows: "Intermittent left hemiparesis, transient, resolved.  Concern for possible complex migraine versus seizure."  Id. at 3.  Ms. Foord was discharged, with an outpatient test[9] and a follow-up neurology appointment scheduled. Doc. nos. 81-2 at 9, 81-4 at 3.  At the time of discharge, Ms. Foord was asymptomatic, ambulatory, walking, talking, and stable.  Doc. no. 81-2 at 7, 14.

The next day, November 20, Ms. Foord called her PCP and reported that "everything is fine."  Id. at 10.  On November 23, Ms. Foord underwent an EEG and was informed by the interpreting physician that the results were normal.  Id.  However, on November 24, she had "the worst headache of [her] life" and died later that day.  Id. at 1, 16.

---

[7] Gadolinium-based contrast agents may be "administered to patients to enhance the quality of MRIs."  McGrath v. Bayer HealthCare Pharm. Inc., 393 F. Supp. 3d 161, 164 (E.D.N.Y. 2019).

[8] An MRV uses technology similar to an MRI but creates imaging of the veins.  See Ricciardi v. Comm'r of Soc. Sec., No. 15 Civ. 1140 (JCF), 2016 WL 6806245, at *4 n.3 (S.D.N.Y. Nov. 16, 2016).

[9] The type of outpatient test that was scheduled is disputed by the parties.  Concord Hospital suggests it was an electroencephalogram (EEG).  Doc. no. 81-1 at 5.  Dr. Foord asserts that it was an MRA with gadolinium.  Doc. no. 90 at 5.

### III. **Discussion**

Dr. Foord brings claims against Concord Hospital for violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), as well as for medical malpractice and loss of consortium under New Hampshire law. The court first addresses Dr. Foord's federal EMTALA claim.

#### A. **Dr. Foord's EMTALA Claim**

Concord Hospital argues that there is no genuine dispute as to whether its treatment of Ms. Foord complied with the requirements set out by EMTALA. Dr. Foord contends that Concord Hospital violated EMTALA by failing to conduct the proper screening tests and failing to stabilize Ms. Foord before discharging her.

Congress passed "EMTALA in 1996 in response to claims that hospital emergency rooms were refusing to treat patients with emergency conditions but no medical insurance." Ramos-Cruz v. Centro Medico del Turabo, 642 F.3d 17, 18 (1st Cir. 2011) (citing Reynolds v. MaineGeneral Health, 218 F.3d 78, 83 (1st Cir. 2000)). Thus, EMTALA "is a limited anti-dumping statute, not a federal malpractice statute." Id. (quoting Reynolds, 218 F.3d at 83); see also Correa v. Hosp. San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995) ("EMTALA does not create a cause of action for medical malpractice."). To make out an EMTALA claim,

a plaintiff must show (1) the hospital is a
participating hospital, covered by EMTALA, that
operates an emergency department; (2) the plaintiff
arrived at the facility seeking treatment; and (3) the
hospital either (a) did not afford the patient an
appropriate screening in order to determine if she had
an emergency medical condition, or (b) released the
patient without first stabilizing the emergency
medical condition.

Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 717 F.3d 63, 68-69

(1st Cir. 2013) (citing Correa, 69 F.3d at 1190).

Neither party disputes that Concord Hospital is a

participating hospital.  Additionally, there is no dispute about

whether Ms. Foord arrived at Concord Hospital seeking treatment.

Therefore, the court must determine whether Concord Hospital

failed to appropriately screen Ms. Foord or diagnosed her with

an emergency medical condition and failed to stabilize that

condition before releasing her.

### 1.  Appropriate Screening

Dr. Foord argues that Concord Hospital failed to

appropriately screen Ms. Foord.  EMTALA does not define

"appropriate medical screening," but the First Circuit has

stated that a participating hospital must provide an examination

"reasonably calculated to identify critical medical conditions

that may be afflicting symptomatic patients and provides that

level of screening uniformly to all those who present

substantially similar complaints."  Id. at 69 (quoting Correa,

69 F.3d at 1192).  A "touchstone" in determining uniform

treatment is "[w]hether a hospital's existing screening protocol was followed in a circumstance where triggering symptoms were identified by hospital emergency room staff . . . ." Id. (citing Cruz-Queipo v. Hosp. Español Auxilio Mutuo de P.R., 417 F.3d 67, 71 (1st Cir. 2005); Battle v. Mem'l Hosp., 228 F.3d 544, 558 (5th Cir. 2000); Summers v. Baptist Medical Ctr. Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996)); see also Correa, 69 F.3d at 1192 ("The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly."). The First Circuit has provided further guidance:

> Circumstances where a screening protocol was not followed when triggering symptoms were identified have been distinguished, for the purposes of EMTALA coverage, from situations where: (1) no screening protocol existed; (2) standard screening procedures existed but were not followed because no identifiable triggering symptoms were presented; and **(3) standard screening procedures were in fact followed when identifiable triggering symptoms were presented but an improper diagnosis resulted.**

Cruz-Vazquez, 717 F.3d at 69 (emphasis added) (citations omitted). To establish a screening violation, however, a plaintiff "need not prove that she actually suffered from an emergency medical condition when she first came through the portals of the defendant's facility; the failure appropriately to screen, by itself, is sufficient to ground

liability as long as the other elements of the cause of action are met." Id. (quoting Correa, 69 F.3d at 1190).

The record demonstrates that Concord Hospital conducted an appropriate screening during Ms. Foord's visit on November 19, 2015. Concord Hospital's Emergency Department policy requires qualified medical personnel to screen, examine, test, and evaluate a patient to determine whether she has an emergency medical condition. See doc. nos. 81-3 at 1, 81-7. After arriving at Concord Hospital on November 19, Ms. Foord underwent thorough screening evaluations conducted by the nursing staff and Dr. Fox. Doc. no. 81-4 at 2-3, 7. The Concord Hospital providers performed MRI and MRA tests on Ms. Foord. Id. at 3. Dr. Fox discussed the results with Dr. Venus, who recommended a CT scan to determine whether there was a subarachnoid hemorrhage. Id. Ms. Foord underwent the CT scan. Id. at 21-22. After reviewing the results of this scan, Dr. Venus concluded that Ms. Foord did not have a subarachnoid hemorrhage. Id. at 3, 21-22. Dr. Fox ultimately diagnosed Ms. Foord with "[i]ntermittent left hemiparesis, transient, resolved. Concern for possible complex migraine versus seizure." Id. at 3.

Concord Hospital's evaluation and treatment of Ms. Foord were "reasonably calculated to identify critical medical conditions." Moreover, based on the undisputed material facts, no reasonable jury could find that Concord Hospital departed

from its standard procedures or applied them in an uneven manner.  In short, even considering the record in the light most favorable to Dr. Foord, Concord Hospital complied with its EMTALA screening requirements.

Dr. Foord puts forward several "disputed" facts and contends that they create a triable issue as to whether Concord Hospital conducted appropriate screening measures.  The court will address the disputes that are material to the appropriate screening inquiry.

Dr. Foord asserts that an MRA was not performed on Ms. Foord's brain but was instead performed on her Circle of Willis. However, this fact – even if taken as true – is immaterial to the EMTALA analysis.  Instead, the issue of whether Ms. Foord's doctors properly conducted the MRA bears on Dr. Foord's medical malpractice claim.

Dr. Foord also asserts that while Dr. Venus indicated that "additional screening examinations" including an MRV and MRI with contrast were necessary, they were never performed.  Doc. no. 90 at 5.  However, in the same paragraph, Dr. Foord concedes that a CT scan was performed.  See id.  Ms. Foord's medical records show that Dr. Venus's preliminary diagnosis of subarachnoid hemorrhage changed based on the findings of the CT scan.  See doc. no. 81-4 at 3, 17-18, 21-22.  EMTALA requires that Concord Hospital conduct the screening tests necessary to

determine whether a patient is suffering from an emergency medical condition. The record shows that in Ms. Foord's case, it did so.

Finally, Dr. Foord asserts that Concord Hospital inaccurately set forth the opinions of his experts, Dr. Stanhiser and Dr. Jensen. He points out Dr. Stanhiser's opinion that Dr. Fox failed to order a CT of Ms. Foord upon her arrival and to admit her based on her findings. Doc. no. 90 at 6. Dr. Foord also highlights Dr. Jensen's statement that Concord Hospital staff should have treated Ms. Foord as a "subarachnoid patient" and that "further screening examinations" including computed tomography angiography (CTA) and computed tomography venography (CTV) tests should have been ordered. Id. The criticism advanced by Dr. Stanhiser and Dr. Jensen is not that Concord Hospital failed to screen Ms. Foord; it is that Concord Hospital screened Ms. Foord incorrectly. Therefore, while these allegations are germane to Dr. Foord's malpractice claim, they are not material to the EMTALA claim.

Throughout his opposition memorandum, Dr. Foord argues that Concord Hospital was required to conduct a battery of imaging tests – including an MRA of the brain (instead of the Circle of Willis), an MRV, an MRI with contrast, a CTA, and a CTV – for a variety of reasons. However, that reading of the statute is misguided. EMTALA requires only that a hospital screen in a

manner reasonably calculated to identify critical medical conditions and provide that level of screening uniformly.  See Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 717 F.3d at 69.  Dr. Foord's relentless entreaties do not reflect the actual requirements of EMTALA.  Taking the existing record into account, there is no genuine dispute regarding whether Concord Hospital followed proper screening procedures.  Thus, to survive summary judgment on his EMTALA claim, Dr. Foord must show that there is a genuine dispute regarding whether Concord Hospital failed to stabilize Ms. Foord before discharging her on November 19, 2015.

### 2.  Duty to Stabilize

Dr. Foord argues that Ms. Foord was suffering from an emergency medical condition, which Concord Hospital failed to stabilize before discharge.  EMTALA defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . placing the health of the individual . . . in serious jeopardy," "serious impairment to bodily functions," or "serious dysfunction of any bodily organ or part . . . ."  42 U.S.C. § 1395dd(e)(1)(A).  The statute goes on to define "to stabilize" as providing "such medical treatment of the condition as may be necessary to assure, within

reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . ." 42 U.S.C. § 1395dd(e)(3)(A).

EMTALA's duty to stabilize "does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient." Alvarez-Torres v. Ryder Mem'l Hosp., Inc., 582 F.3d 47, 51 (1st Cir. 2009) (quoting Fraticelli-Torres v. Hosp. Hermanos, 300 F. Appx. 1, 4 (1st Cir. 2008)). In short, "[t]he stabilization provision requires a covered hospital, within its staff and facilities, to provide an individual it determines has an emergency medical condition with 'such further medical examination and such treatment as may be required to stabilize the medical condition.'" Id. at 52 (quoting 42 U.S.C. § 1395dd(b)(1)(A)).

The undisputed material facts show that Concord Hospital stabilized Ms. Foord before discharging her on November 19. Following a variety of tests and consultations, Ms. Foord discussed a discharge plan with her doctors, which included outpatient treatment. Doc. nos. 81-2 at 14-15, 81-4 at 3. Dr. Foord admits that upon discharge, Ms. Foord was asymptomatic and stable. Doc. no. 81-2 at 7, 14. Dr. Foord now insists that

because Ms. Foord still had abnormal findings at the time of discharge and was actually suffering from a subarachnoid hemorrhage, she had an emergency medical condition and by definition could not be stabilized. However, this argument is tautological; under that reasoning, any medical malpractice case in which the doctors failed to correctly diagnose an emergency condition and thereafter released the patient would trigger EMTALA. This does not accurately reflect the legal requirements under EMTALA. See Correa, 69 F.3d at 1192 ("EMTALA does not create a cause of action for medical malpractice."). The doctors at Concord Hospital did not diagnose a subarachnoid hemorrhage and therefore acted reasonably based on their diagnosis.[10] Thus, there is no genuine dispute that Ms. Foord's

_____

[10] Dr. Foord asserts that "cases in the First Circuit impose a duty on the hospital to stabilize the patient based on the question of whether deterioration of the patient's condition is likely to occur within reasonable medical probability," citing to Correa, 69 F.3d. Doc. no. 90 at 13-14. However, the issue in Correa related to the appropriate screening requirement, not the duty to stabilize, and did not set out the standard advanced by Dr. Foord. See Correa, 69 F.3d at 1192 n.7 ("Because we uphold the jury's finding that HSF violated EMTALA when it failed to afford Ms. Gonzalez an appropriate screening, we need not comment upon the jury's finding that HSF also violated EMTALA by improperly transferring Ms. Gonzalez before her condition had stabilized."). While Dr. Foord critiques the authority offered by Concord Hospital on this point, it appears that the First Circuit has adopted this interpretation. See Reynolds, 218 F.3d at 85 ("It is doubtful that the text of the statute would support liability under the stabilization provision for a patient who had DVT, absent evidence sufficient to support a finding that the hospital knew of his DVT."); see also Kenyon v. Hosp. San Antonio, Inc., 951 F. Supp. 2d 255, 264

doctors at Concord Hospital stabilized her before discharge.

Concord Hospital's motion is granted on the EMTALA claim.

**B.    Supplemental Jurisdiction**

At oral argument, Dr. Foord urged the court to exercise its

supplemental jurisdiction over his state claims if summary

judgment was granted on the EMTALA claim.  Unsurprisingly,

Concord Hospital takes the converse position.  A district court

has "considerable authority whether to exercise [supplemental

jurisdiction], considering factors such as judicial economy,

convenience, fairness to litigants, and comity." Ramos-

Echevarria v. Pichis, Inc., 659 F.3d 182, 191 (1st Cir. 2011)

(citing Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991)).

The court "may decline to exercise supplemental jurisdiction

over a claim . . . **if . . . the district court has dismissed all**

**claims over which it has original jurisdiction** . . . ."  28

U.S.C. § 1367 (emphasis added).  Moreover, "[w]hen a plaintiff's

anchor claim is a federal cause of action and the court

---

(D.P.R. 2013) ("Thus, by its plain language, the statute does
not provide a cause of action when a hospital does not stabilize
an emergency medical condition that it negligently failed to
diagnose.").  While EMTALA does include the "reasonable medical
probability" language that Dr. Foord emphasizes, it is limited
to situations where the deterioration would "result from or
occur during the transfer . . . ."  42 U.S.C. § 1395dd(e)(3)(A);
see also Fraticelli-Torres, 300 F. App'x at 4.  Dr. Foord's
argument on this point essentially disputes the accuracy of the
diagnosis, which bears on the malpractice claim but does not
affect the EMTALA analysis.

unfavorably disposes of the plaintiff's federal claim at the early stages of a suit, well before trial, the court generally dismisses any supplemental state-law claims without prejudice." Ramos-Echevarria, 659 F.3d at 191 (citing Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)).

As the court now grants Concord Hospital's motion for summary judgment on Dr. Foord's EMTALA claim, only his state law claims for medical malpractice and loss of consortium would remain. The court declines to exercise supplemental jurisdiction and dismisses Dr. Foord's state claims without prejudice to refiling in state court.

## IV.  **Conclusion**

For the reasons above, Concord Hospital's motion for summary judgment is granted as to Dr. Foord's EMTALA claim. The state law claims against Concord Hospital are dismissed without prejudice.

SO ORDERED.

Andrea K. Johnstone
United States Magistrate Judge

January 27, 2020

cc:  Paul M. Monzione, Esq.
     Todd J. Hathaway, Esq.
     Abby Tucker, Esq.
     William N. Smart, Esq.
     Nicholas D. Meunier, Esq.
     Christopher M. Bracci, Esq.
     John D. Cassidy, Esq.